Jose **GARCIA–RAMOS**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 84–7350.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 1985.

Decided Nov. 7, 1985.

Paula D. Pearlman, El Centro, Cal., for petitioner.

Richard K. Willard, Acting Asst. Atty. Gen., Lauri Steven Filppu, Deputy Director, Joan E. Smiley, Atty.; Dept. of Justice, Washington, D.C., for respondent.

Before SCHROEDER and FLETCHER, Circuit Judges, and McKIBBEN,* District Judge.

FLETCHER, Circuit Judge:

Garcia-Ramos ("Garcia") appeals the BIA's decision denying his application for asylum and his request for withholding of deportation. We affirm the denial of withholding of deportation, but reverse and remand the denial of asylum.

## I. BACKGROUND

Garcia is a twenty-one year old native and citizen of El Salvador. He came to the

---

* The Hon. Howard D. McKibben, United States District Judge for the District of Nevada, sitting by designation.

United States in 1979,[1] and the INS brought deportation proceedings against him, charging him with entry without inspection. 8 U.S.C. § 1251(a)(2) (1982). He conceded deportability, but requested asylum.[2]

In his asylum application and his testimony before the immigration judge ("IJ"), Garcia contended that he feared persecution by the Salvadoran government. He had belonged to the Frente Popular de Liberacion (the Popular Front for Liberation or "FPL"), a leftist political group opposed to the government. He and other group members distributed propaganda, painted slogans on buildings, and stole food to distribute to the poor. He planted fake bombs to divert the attention of government troops so that the group's activities could be carried out, and he also acted as an armed guard or lookout during some FPL activities. Garcia never wore a mask during these activities, which were performed during daylight hours. In addition, he participated in several large public demonstrations protesting the government and its policies. He was active in the FPL for approximately four months, immediately prior to his departure for the United States. Garcia was never arrested or charged for his activities.

Garcia left El Salvador at his parents' urging; they feared that his activities had endangered his and their safety. They gave him money so he could leave the country. He obtained a passport by bribing a government official and left El Salvador without difficulty. His parents and three sisters still live in El Salvador.

In addition to his testimony, Garcia presented at the hearing several articles discussing the conditions and turmoil in El Salvador.

The IJ considered the evidence and denied Garcia's request for asylum or withholding of deportation and denied voluntary departure.[3] The IJ also found that Garcia's testimony was not credible.[4] The BIA affirmed the IJ's decision and concluded that Garcia had failed to show a likelihood of persecution even assuming all his testimony to be true. Garcia timely appealed the BIA decision.

## II. DISCUSSION

Although the BIA and the IJ considered and rejected Garcia's asylum and section 243(h) claims together, they are in fact separate and distinct remedies. We address them discretely, considering first the more stringent showing required under section 243(h) and then turning to the more generous standard applicable for section 208(a) asylum. *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1283 (9th Cir.1984).

### A. Withholding of Deportation under Section 243(h)

Section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h) (1982), prohibits the Attorney General from deporting an alien whose life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. Section 243(h) withholding of deportation is a mandatory form of relief, *see Espinoza-Martinez v. INS*, 754 F.2d 1536, 1539 (9th Cir.1985), available if a petitioner establishes a "clear probability" of persecution, *INS v. Stevic*, 467 U.S. 407, 104 S.Ct. 2489,

---

1. The precise date of Garcia's entry is not clear. He testified that he left El Salvador on December 24, 1979 and came directly to the United States, but he also admitted the allegations contained in the Order to Show Cause, which charged him with entry in 1981.

2. In accordance with its regulations, 8 C.F.R. § 208.3(b), (1984), the INS treated the asylum application as also constituting a request for withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1982).

3. Garcia does not contest the denial of voluntary departure on this appeal.

4. The IJ based his credibility determination on two grounds: first, that Garcia "had fathered a child out of wedlock in the United States," thus demonstrating his "disrespect[ ] of the civil laws of the United States"; and, second, that there were discrepancies between Garcia's testimony and his asylum application concerning the date he entered the United States.

2492, 81 L.Ed.2d 321 (1984). The clear probability standard requires the petitioner to show that it is "more likely than not that [he] would be subject to persecution." *Id.* at ——, 104 S.Ct. at 2498. We review a denial of section 243(h) relief under the substantial evidence standard. *Bolanos-Hernandez*, 767 F.2d at 1282 n. 8; *Zepeda-Melendez v. INS*, 741 F.2d 285, 289 (9th Cir.1984).

■ Even assuming the truth of all of Garcia's testimony, we conclude that he has not met his burden of establishing a clear probability of persecution. Although Garcia may have engaged in extensive political activity in El Salvador, and may have been identified as a member of the government opposition, he was never harrassed, arrested, or charged, and his family have remained in El Salvador without incident. Garcia has not presented any evidence that the government was aware of his political activities.

Garcia's evidence does not rise to the degree of probability of persecution we have held to be sufficient for section 243(h) relief in other cases. *See, e.g., Argueta v. INS*, 759 F.2d 1395, 1397 (9th Cir.1985) (petitioner showed that direct threats had been made against him and that his brother-in-law had been tortured and killed by the same persons who threatened petitioner); *Bolanos-Hernandez*, 767 F.2d at 1280 (petitioner, a former member of a right-wing political party, was threatened by guerrillas after he refused to join them; guerrillas had used similar tactics to recruit petitioner's brother and had killed five of petitioner's friends); *McMullen v. INS*, 658 F.2d 1312, 1317–18 (9th Cir.1981) (petitioner deserted from the British army to join the Provisional Irish Republican Army (PIRA); he had been imprisoned for PIRA activities and intimidated, threatened, and

kidnapped for refusing to participate in PIRA activities).

Garcia's evidence may establish a *possibility* of persecution, but section 243(h) requires a showing of a *probability* or *likelihood* of persecution. *See Bolanos-Hernandez*, 767 F.2d at 1281. The BIA's denial of Garcia's section 243(h) claim is supported by substantial evidence.

*B. Asylum under Section 208(a)*

■ Under section 208(a) of the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 101, 8 U.S.C. § 1158(a) (1982), asylum is a discretionary form of relief, available if an alien meets the definition of a "refugee." *Espinoza-Martinez*, 754 F.2d at 1539. A refugee is one who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion ...." 8 U.S.C. § 1101(a)(42)(A) (1982). We apply a two-part standard of review to an asylum decision, first evaluating whether there is substantial evidence of a well-founded fear of persecution, and then applying an abuse of discretion standard to the ultimate decision granting or denying asylum. *Espinoza-Martinez*, 754 F.2d at 1539.

■ We have held that the well-founded fear standard is "more generous" than the clear probability standard. *Bolanos-Hernandez*, 767 F.2d at 1282; *accord Arqueta*, 759 F.2d at 1396–97.[5] In *Bolanos-Hernandez*, we concluded that the phrase "well-founded fear" embodies both subjective and objective elements. 767 F.2d at 1283. The word "fear" connotes subjective considerations, *see* United Nations High Commission for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 37 (1979), thus requiring evaluation of an applicant's state of mind, *see*

---

5. Our cases have not yet fleshed out the precise meaning of the phrase "well-founded fear" of persecution. *See Bolanos-Hernandez*, 767 F.2d at 1283 n. 11. In all our recent cases, we have decided either that the evidence supports relief under both sections 243(h) and 208(a), *see, e.g., Argueta*, 759 F.2d at 1397–98; *Bolanos-Hernan-* dez, 767 F.2d at 1288; *Zavala-Bonilla v. INS*, 730 F.2d 562, 563–64 nn. 1 & 2, 567 (9th Cir.1984), or that the evidence supports neither form of relief, *see, e.g., Saballo-Cortez v. INS*, 761 F.2d 1259, 1262 (9th Cir.1985); *Espinoza-Martinez*, 754 F.2d at 1540; *Chavez v. INS*, 723 F.2d 1431, 1433 (9th Cir.1984).

*Bolanos-Hernandez,* 767 F.2d at 1283 n. 11. That the fear must be "well-founded" implicates a requirement of objective reasonableness. In other words, there must be some basis in reality or reasonable possibility that a petitioner would be persecuted. *See Stevic,* 467 U.S. at ——, 104 S.Ct. at 2498. In this regard, the " 'conditions in the country of origin, its laws, and the experience of others' " are relevant factors to consider. *Bolanos-Hernandez,* 767 F.2d at 1283 n. 11 (quoting *Stevic v. Sava,* 678 F.2d 401, 406 (2d Cir.1982), *rev'd on other grounds sub. nom, INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984)).

 If Garcia's testimony is believed, we conclude that he has shown sufficiently that he fears persecution and that his fear is well-founded.

Garcia testified that he participated in a number of FPL activities. He participated in public demonstrations, distributed propaganda, and painted political slogans on buildings. He helped to rob grocery trucks to obtain food for the poor, and he planted fake bombs to divert the attention of government officials. He also acted as an armed guard for people engaged in a hunger strike, who were hiding in a church. Most of these activities occurred during the day and he never wore a mask or disguise.

Garcia testified that he fears persecution because his identity and affiliation with the FPL might have become known to government officials. He also testified that his parents gave him money to leave El Salvador, because they too feared for his safety. We conclude that these fears are reasonable.

The government argues, however, that Garcia has not shown that he and his family were harrassed or harmed for his political activities.[6] Obviously, such evidence would lend considerable strength to a claim that one fears persecution, but such evidence is not essential to an asylum claim. A well-founded fear of persecution can be established by other evidence, such as Garcia's evidence of his membership in a persecuted political organization, his extensive activities while a member of that organization, and his reasons to believe that he might have been identified as a member.

The government also relies heavily on the fact that Garcia obtained a passport to leave El Salvador. Some of our cases suggest that an alien's ability to obtain a passport or exit visa may be an indication that his native government would not persecute him. *See Espinoza-Martinez,* 754 F.2d at 1540. Here, however, Garcia obtained his passport by paying a bribe to a government official: his ability to obtain a passport may have little or no relevance to his claim of possible persecution.[7] *See Saballo-Cortez,* 761 F.2d at 1266, (discussing *McMullen,* 658 F.2d at 1314, and emphasizing that McMullen obtained a visa by using an assumed name).

Finally, the government asserts that Garcia came to the United States not for fear of persecution, but for economic reasons, to avoid the draft, and to avoid criminal prosecution for his political activities. However, if we credit Garcia's testimony, a significant reason for his fleeing El Salvador was his fear of persecution. We do not find it inconsistent with a claimed fear of persecution that a refugee, after he flees his homeland, goes to the country where he believes

6. Garcia did assert in his asylum application that his cousin had been killed by government troops, but he did not mention this at the hearing, and he failed to explain in any respect why his cousin was killed, or how his death might be related to Garcia's activities.

7. Additionally, we doubt whether such evidence should be entitled to much weight in any asylum case. If a government considered an individual to be a troublemaker, it might actually prefer to have him leave the country. The Cuban "Freedom Flotila" is an illustration. *See*

United Nations High Commission for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 48 (1979) ("Possession of a passport cannot ... always be considered as ... an indication of the absence of fear. A passport may ... be issued to a person who is undesired in his country of origin, with the sole purpose of securing his departure, and there may also be cases where a passport has been obtained surreptitiously.... [T]he mere possession of a valid national passport is no bar to refugee status.").

his opportunities will be best. Nor need fear of persecution be an alien's only motivation for fleeing.

Because Garcia's testimony, if believed, is sufficient to establish a well-founded fear of persecution, the BIA's decision is not supported by substantial evidence. Accordingly, we remand this case to allow the BIA to review the record in light of the proper standards, to correct any factual errors,[8] and to make credibility findings.[9] *See Argueta,* 759 F.2d at 1397–98 & n. 4.

### III. CONCLUSION

We affirm the BIA's denial of withholding of deportation but remand for further consideration of the asylum claim.

AFFIRMED in part, and REVERSED and REMANDED in part.

8. The BIA's finding that "[Garcia] took pains to avoid being identified as a guerrilla symphathizer while he was in El Salvador" is in error. The record reflects, rather, that Garcia's activities were open and notorious. This mistake may have been a significant factor in the BIA's decision.

9. As we noted above, *see supra* note 2, the IJ made only two express credibility findings. The BIA rightly criticized one of those findings when it stated that "fathering a child out of wedlock is not relevant to a determination of credibility." The other finding lacks probity; the inconsistency between papers Garcia filed and his testimony concerning his entry date are likely no more than a typographical error.