Alberto **DAMAIZE–JOB,** Petitioner,

v.

**IMMIGRATION AND NATURALIZA-TION SERVICE,** Respondent.

No. 83–7898.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1985.

Decided April 21, 1986.

Eliseo Sisneros and Paula D. Pearlman, El Centro, Cal., for petitioner.

David V. Bernal and James A. Hunolt, Washington, D.C., for respondent.

Before SCHROEDER and FLETCHER, Circuit Judges, and BURNS,* District Judge.

FLETCHER, Circuit Judge:

Alberto Damaize-Job appeals from the Board of Immigration Appeals's (BIA's) denial of his application for withholding of deportation under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h) (1982), and for political asylum under section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a) (1982). We find that the BIA's decision is not supported by substantial evidence, and that Damaize satisfies both the "clear probability of persecution" standard of section 243(h) and the "well-founded fear of persecution" standard of section 208(a). We therefore reverse the BIA on Damaize's section 243(h) claim and reverse and remand on his section 208(a) claim so that the Attorney General can exercise his discretion and determine whether to grant Damaize asylum.

## FACTUAL BACKGROUND

Damaize is a native and citizen of Nicaragua who entered the United States in 1982 by evading inspection at the Mexican border. The INS began deportation proceedings against him later that year, alleging in an order to show cause that he had violated section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1982).

Damaize conceded deportability, but filed an application for asylum under section 208 of the Refugee Act, 8 U.S.C. § 1158.[1] In his application and at his deportation hearing, Damaize indicated that he was a Somocista, or a supporter of the Somoza regime, which preceded Nicaragua's current Sandinista government, and that he is also a Miskito Indian.[2] Damaize testified that in 1979, the Sandinistas falsely accused him of being a Somocista National Guardsman, and arrested and imprisoned him for three months. He testified that while he was in prison, the Sandinistas beat him and tortured him, kept him tied for seven or eight days at a time without any food, and only provided him with water by throwing it on the floor of his cell, so that he had to lick it up. Damaize testified that his captors threatened him with death several times, and when they released him, warned that he would be killed if he were seen again. He also testified that his uncle and sister were accused of helping the Somocistas (a charge frequently made against Miskitos), were taken away, and are now believed dead. To support his claims, Damaize submitted copies of newspaper articles detailing the persecution of the Miskitos by the Sandinistas in Nicaragua.

Damaize testified that he left Nicaragua a month after his release by the Sandinistas and traveled to Costa Rica, where he remained for one year. He testified that he returned to Nicaragua in 1980 because his uncle and sister had been arrested, but was later told by a Sandinista soldier, who was also a Miskito, that they had been killed by the Sandinistas. Damaize testified that after receiving this news, he obtained a Nicaraguan passport through a friend, and eventually came to the United States in 1982, because he was told he could qualify as a refugee in this country.

The immigration judge (IJ) found Damaize deportable and denied his application for asylum and withholding of deportation. The IJ questioned Damaize's credibility based on three separate grounds: (1) there were discrepancies between Damaize's oral testimony and his asylum application con-

---

* Honorable James M. Burns, Chief United States District Judge for the District of Oregon, sitting by designation.

1. An application for asylum under section 208 of the Refugee Act is deemed to be also an application for withholding of deportation under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h). 8 C.F.R. § 208.3(b).

2. Miskitos are indigenous Nicaraguans who live primarily on the country's Atlantic Coast and who, the record indicates, have been severely persecuted by Nicaragua's Sandinista government.

cerning the birthdates of his two children;[3] (2) Damaize never married the mother of his two children;[4] and (3) Damaize never applied for asylum in any other country through which he traveled on his way to the United States, or in any United States embassies in those countries. Even assuming that Damaize's testimony was true, the IJ found the evidence presented by Damaize to be insufficient to justify relief under either section 243(h) or 208(a). The IJ found that although the documentary evidence submitted by Damaize generally indicated the existence of a Sandinista campaign against the Miskito Indians, Damaize failed to demonstrate that he was ever singled out for persecution due to his political views or membership in the Miskito social group. The IJ also found Damaize's evidence insufficient to establish conclusively that his uncle and sister had been killed. Finally, the IJ found that Damaize's uneventful stay in Nicaragua between 1980 and 1982 undermined his claim that he would be persecuted if he returns now.

Damaize appealed the IJ's decision to the BIA, which dismissed his appeal. The BIA affirmed the IJ's decision, based on the fact that Damaize was able to remain in Nicaragua between 1980 and 1982 without incident and was issued a passport by the government, and based on the fact that the governmental persecution of Miskitos detailed in the record is primarily limited to the Atlantic Coast of Nicaragua, far from Managua, where Damaize lived since 1976.

Damaize now appeals to this court, contending that the IJ imposed a higher burden of proof than required, that the IJ's and BIA's findings are not supported by substantial evidence, and that the IJ's refusal to admit evidence of Damaize's religious beliefs and practices denied him due process of law. Because we conclude that the IJ's and BIA's denial of relief under sections 243(h) and 208(a) were not supported by substantial evidence, we need not reach Damaize's other points of appeal.

## ANALYSIS

### A. "Withholding of Deportation" Under Section 243(h).

In order to qualify for section 243(h)'s prohibition against deportation, Damaize must demonstrate a clear probability that his life or freedom will be threatened in Nicaragua if he returns, because of his race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C. § 1253(h). He must introduce some specific evidence showing that such persecution, if carried out, would be directed toward him as an individual. *Espinoza-Martinez v. INS*, 754 F.2d 1536, 1540 (9th Cir.1985); *Bolanos-Hernandez v. INS.*, 767 F.2d 1277, 1284 (9th Cir.1984).

#### 1. Standard of Review

The mandatory language of section 243(h) makes an abuse of discretion standard of review inappropriate. *Bolanos-Hernandez*, 767 F.2d at 1282 n. 8. Instead, we review the BIA's denial of Damaize's application for relief under section 243(h) under the substantial evidence standard. *Id.; Zepeda-Melendez v. INS*, 741 F.2d 285, 289 (9th Cir.1984).

#### 2. Damaize's Evidence Concerning The Likelihood of Persecution.

To demonstrate that his life or freedom will be in jeopardy if he returns to Nicaragua, Damaize provided testimony concerning his 1979 arrest and imprisonment on charges of being a Somocista

---

**3.** According to the IJ, Damaize's asylum application indicated that his daughter was born in 1967, while he testified that she was born in 1968. His asylum application also apparently indicated that his other child was born in 1947, nine months after he was born. The IJ did not indicate that Damaize could have believed he was gaining anything by providing this inaccurate information.

**4.** The IJ indicated specifically that Damaize's failure to marry the mother of his children "raises some questions about his morality," and there is some indication that it affected the IJ's assessment of Damaize's credibility as well.

Guardsman, the explicit threats on his life, and the disappearance of his uncle and sister, whom the Sandinistas similarly accused of being Somocistas, and he also provided newspaper accounts of Sandinista persecution of the Miskitos. We held that similar evidence and testimony established a clear probability of persecution in *Bolanos-Hernandez v. INS*, 767 F.2d 1277 (9th Cir.1984). In that case, the petitioner, a native and citizen of El Salvador, testified that guerrillas had threatened to kill him if he did not join their forces. *Id.* at 1280. He also testified that the guerrillas had killed some of his friends and used similar coercive tactics on his brother. *Id.* We held that this testimony, supported by newspaper articles documenting a general climate of violence in El Salvador, was sufficient to entitle Bolanos-Hernandez to withholding of deportation under section 243(h). *Id.* at 1284–86.

Moreover, in *Argueta v. INS*, 759 F.2d 1395 (9th Cir.1985), we relied upon similar testimony in reversing the BIA's determination that the petitioner failed to establish either a clear probability or a well-founded fear of persecution. In *Argueta,* the petitioner, also a native and citizen of El Salvador, testified that because of his neutral political stance, his life had been threatened. According to the petitioner, the day after the threat was made, his brother-in-law was killed by the same men who threatened him. We concluded that Argueta's allegations, if true, were sufficient to establish that he would be subject to persecution if he were forced to return to El Salvador. *Id.* at 1397.

■■■■ Damaize's situation, as revealed by the evidence and testimony he has presented, is much the same as that of Bolanos and Argueta. However, the BIA insisted that because Damaize was able to remain unharmed in Nicaragua between 1980 and 1982, and because he was able to obtain a Nicaraguan passport prior to his departure, he has neither a well-founded fear nor a clear probability of being persecuted. Yet these two facts do not, in the context of this record, constitute substantial evidence supporting the government's position. Damaize testified that he returned to Nicaragua in 1980 only because his uncle and sister had been arrested, and he thought they might need his help; he testified that throughout his stay, he feared for his life. Damaize also testified that he did not personally contact Nicaraguan authorities to obtain his passport, but instead, obtained it through a friend. It is clear that "the mere possession of a valid national passport [from one's country of origin] is no bar to refugee status," since "[p]ossession of a passport cannot ... always be considered as evidence of loyalty on the part of the holder, or ... of the absence of fear"; passports are often "issued to a person who is undesired in his country of origin [for] the sole purpose of securing his departure." United Nations High Commission for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status,* ¶ 48 (1979);[5] *accord Garcia-Ramos v. INS,* 775 F.2d 1370, 1374 & n. 7 (9th Cir.1985).

■■ In rejecting Damaize's claim, the BIA also relied upon the fact that the Sandinista persecution of Miskitos detailed in the record has been primarily concentrated on Nicaragua's Atlantic Coast, far from Managua, where Damaize has lived since 1976. However, the record does not indicate any clear intent on the part of the Sandinistas to limit their persecution to any one geographical area, and Damaize testified that he can be readily identified as a Miskito wherever he goes. Damaize's pri-

---

**5.** The United Nations definition of what factors are relevant in determining refugee status are particularly significant in analyzing section 243(h) and 208(a) claims, because Congress specifically passed The Refugee Act of 1980 with the intent of bringing United States statutory provisions concerning refugees into conformity with the provisions of the United Nations Convention Relating to the Status of Refugees. *See* S.Rep. No. 256, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 144; H.R.Conf.Rep. No. 781, 96th Cong., 2d Sess. 19, 20, *reprinted in* 1980 U.S.Code Cong. & Ad.News 160, 161; *see also Bolanos-Hernandez,* 767 F.2d at 1280 & n. 2.

or arrest, incarceration and persecution belie the government's argument. The record indicates that the former United States Secretary of State has characterized the Sandinistas' treatment of Miskitos in Nicaragua as "genocide." Where it is apparent, as it is in this case, that petitioner is a Miskito and has been subjected to Sandinista persecution in the past, the BIA may not ignore the evidence.

For all these reasons, the BIA's conclusion that Damaize did not demonstrate a clear probability of persecution is not supported by substantial evidence. We therefore conclude that Damaize's allegations, if true, are sufficient to satisfy the clear probability of persecution standard of section 243(h) and would entitle him to withholding of deportation under section 243(h).

### 3. The Credibility Findings of the IJ

The IJ questioned Damaize's credibility for three specific reasons: (1) the discrepancies in certain dates provided in his asylum application and oral testimony; (2) his failure to marry the mother of his two children; and (3) his failure to apply for asylum in the other countries which he visited or in which he worked prior to coming to the United States. We conclude that none of these is a valid ground upon which to base a finding that an asylum applicant is not credible.

First, minor discrepancies in dates that are attributable to the applicant's language problems or typographical errors and cannot be viewed as attempts by the applicant to enhance his claims of persecution have no bearing on credibility. Damaize stated in his oral testimony that his daughter was born in 1968 and in his asylum application that she was born in 1967; his asylum application indicated that his other child was born nine months after Damaize himself was born, which was clearly a mistake. The IJ nowhere explained how these inaccuracies reflected on the credibility of his persecution claims or for what possible reason Damaize would intentionally have provided incorrect information on such trivial points. These trivial errors merely provided an excuse upon which to predicate a finding of no credibility.

Second, to the extent that the IJ questioned Damaize's credibility based upon his failure to marry the mother of his children, this was clearly impermissible. *See Garcia-Ramos*, 775 F.2d at 1375 n. 9. The personal choices that an asylum applicant has made concerning marriage, children, and living arrangements should not be used to evaluate the applicant's credibility concerning his claims of persecution, unless they reflect some inconsistency in a relevant portion of the applicant's testimony.

Finally, Damaize's failure to apply for asylum in any of the countries through which he passed or in which he worked prior to his arrival in the United States does not provide a valid basis for questioning the credibility of his persecution claims. The IJ appears to have assumed that an individual who truly fears persecution in his homeland will automatically seek asylum in the first country in which he arrives. However, there is no basis for this assumption. Damaize's claims of persecution are no less credible because once he left Nicaragua, he was not satisfied with "any port in a storm." It is quite reasonable for an individual like Damaize, who has experienced persecution in Nicaragua, to seek a new homeland that is insulated from the instability of Central America and that offers more promising economic opportunities. *See Garcia-Ramos v. INS*, 775 F.2d at 1374–75. Moreover, to qualify for relief under sections 243(h) and 208(a), Damaize must demonstrate only that he may be "subject to persecution *in [his] homeland[ ]*." Refugee Act of 1980, § 101, Pub.L. No. 96–212, 94 Stat. 101, 102 (codified as *Congressional Declaration of Policies and Objectives*, at 8 U.S.C. § 1521 note (1982)) (emphasis added). Thus, it was perfectly consistent for Damaize, once he was out of Nicaragua and thus out of immediate danger, not to seek asylum in the first place where he arrived. Da-

maize's failure to contact United States embassies in Central America and Mexico may simply indicate a lack of awareness about this procedure, a fear of authority or rejection, or both.

In short, the information relied upon by the IJ to question Damaize's credibility reveals nothing about whether or not Damaize is an honest individual, or whether or not he feared for his safety in Nicaragua. The IJ had no legitimate, articulable basis to question Damaize's credibility, see Lewin v., Schweiker, 654 F.2d 631, 635 (9th Cir.1981), nor did he offer "a specific, cogent reason for [his] disbelief." Id. (quoting Stuart v. Califano, 443 F.Supp. 842, 848 (W.D.Mo.1978)).

In the present case, the record has been thoroughly developed. Damaize testified in detail concerning his activities since 1979 and his basis for believing that he likely will be persecuted if he returns to Nicaragua. Damaize vividly described his incarceration, his torture, the threats to his life, and his fears of persecution as a Miskito. The IJ had a full opportunity to cross-examine Damaize and to expose any internal inconsistencies and improbabilities in his story. See California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (cross-examination is the " 'greatest legal engine ever invented for the discovery of truth' ") (citation omitted). Yet other than the impermissible or insignificant reasons given by the IJ for questioning Damaize's testimony, there is a "total absence of contradictory evidence" in the record as a whole that potentially undermines Damaize's credibility. Lewin v. Schweiker, 654 F.2d at 636. Nor is there "any inherent improbability [or inconsistency] in [Damaize's] testimony" itself. White Glove Building Maintenance v. Brennan, 518 F.2d 1271, 1274 (9th Cir.1975).

We presume that if the IJ had any additional reasons to doubt Damaize's credibili-

ty, the IJ would have stated so in the decision below. Because the IJ expressed no further concerns, and the only explicitly articulated reasons rested on impermissible factors, then we conclude from the IJ's opinion that Damaize was an otherwise credible witness. See Saballo-Cortez v. INS, 761 F.2d 1259, 1266 (9th Cir.1985) (we defer to an immigration judge's express and implied findings, if the record supports such findings) (emphasis added).

### 4. Credibility Determination of the BIA.

The Board has the power to review the record de novo and make its own findings of fact, including credibility determinations. See Cardoza-Fonseca v. INS, 767 F.2d 1448, 1455 (9th Cir.1985). It is our practice to remand to the Board for credibility findings whenever we reverse a Board decision in which the Board has expressly abstained from deciding the credibility issue, see Canjura-Flores v. INS, 784 F.2d 885, 889 (9th Cir.1986); Garcia-Ramos v. INS, 775 F.2d 1370, 1372–75 (9th Cir.1985); Argueta v. INS, 759 F.2d 1395, 1398 n. 4 (9th Cir. 1985), or when we cannot determine the basis of the Board's decision. See Cardoza-Fonseca, 767 F.2d at 1455.

However, when the Board's decision is silent on the question of credibility, and the Board has fully explained the rationale behind its decision, we will presume that the Board found the petitioner credible, and proceed to review the Board's decision. Canjura-Flores, 784 F.2d at 889.

In Damaize's case, the Board's decision was silent on the issue of credibility. We therefore presume that the BIA found Damaize to be a credible witness.[6] Any other conclusion would result in unwarranted second-guessing on our part and the injection of new issues that the BIA did not raise below. See id. at 888–89.

---

**6.** While it is conceivable that the BIA shared the IJ's concerns regarding Damaize's credibility, any reliance on the IJ's stated reasons would be inappropriate and unsupported by substantial evidence.

## B. *Political Asylum Under Section 208(a)*

██ Since the "well-founded fear" standard of section 208(a) is "more generous" than section 243(h)'s "clear probability" standard, our conclusion that Damaize qualifies for withholding of deportation under section 243(h) means *"a fortiori* [that he has] demonstrated a well-founded fear of persecution." *Bolanos-Hernandez*, 767 F.2d at 1288. Therefore, Damaize qualifies as a refugee under section 101(a) of the Refugee Act, and is eligible for a discretionary grant of asylum under section 208(a). *See id.; see also Espinoza-Martinez v. INS*, 754 F.2d at 1539. We therefore remand so that the Attorney General can exercise his discretion and determine whether to grant Damaize political asylum in accordance with the factors enumerated in 8 C.F.R. § 208.8 (1985).[7]

## C. *Conclusion*

We conclude that Damaize has satisfied the requirements for withholding of deportation under section 243(h), and therefore may not be deported, and we conclude that he is eligible for political asylum under section 208(a).

REVERSED as to Section 243(h) claim; REVERSED and REMANDED as to section 208(a) claim.

BURNS, J., respectfully dissents.

---

7. Because a grant of asylum would provide Damaize with benefits that are not automatic with a grant of relief under section 243(h), *see, e.g.,* 8 C.F.R. § 209.2 (1984) (after one year, alien may apply for readjustment of status to permanent resident alien), Damaize may wish to be granted asylum in addition to being granted the section 243(h) relief. *See Bolanos-Hernandez,* 767 F.2d at 1288 n.19.