12 F.3d 1111
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Kamalawathie Surasingha WIJERATHE, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-70036.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 8, 1993.
Decided Nov. 19, 1993.
 
 1
 Before: FLETCHER and D.W. NELSON, Circuit Judges, and HUBERT L. WILL,* Senior District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Kamalawathie Surasingha Wijerathe filed applications for asylum and withholding of deportation, and in the alternative requested voluntary departure. An Immigration Judge (IJ) denied the applications on the basis of a finding that Wijerathe's documentary evidence and testimony were not credible. The IJ also denied voluntary departure. The Board of Immigration Appeals (BIA) affirmed. Wijerathe seeks review.
 
 
 4
 We have jurisdiction to review orders of deportation pursuant to 8 U.S.C. Sec. 1105(a). We affirm the denial of asylum and witholding of deportation, but reverse the denial of voluntary departure.
 
 BACKGROUND
 
 5
 Wijerathe is a native of Sri Lanka. She came to the United States on a visitor's visa on July 5, 1987, and commenced living in Texas. Upon hearing that she was being held at a family's home against her will, a relative called local police, who removed her from the house. When the INS was informed that her visa had expired, deportation proceedings were commenced.
 
 
 6
 At a hearing before an IJ in San Antonio on September 14, 1988, Wijerathe conceded her deportability and was granted one year in which to voluntarily depart the United States. The INS appealed the one-year term, contending that six months was the maximum period provided for in the applicable regulations.
 
 
 7
 On January 9, 1989 the Chief Immigration Judge requested the IJ in San Antonio to re-hear Wijerathe's case, as the magnetic tape recording of the proceedings had inadvertantly been destroyed. Before that could take place, Wijerathe made a successful motion for change of venue, to Los Angeles.
 
 
 8
 Before the IJ in Los Angeles, Wijerathe (now represented by different counsel) for the first time indicated she would be applying for asylum. She filed an application for asylum on July 12, 1989. A lengthy series of hearings followed.
 
 
 9
 At the hearings and in her application for asylum, Wijerathe claimed she had been a life-long member of the All Ceylon Government Typists Union (ACGTU), and had participated in a number of strikes called by the Union. In 1980 she participated in a strike called by the ACGTU and other state unions, and as a result lost her job. She was reinstated about 8 months later, but was put on one year probation and warned not to participate in any more labor unrest. She also claimed that as a result of her union membership she was transferred numerous times between 1980 and 1986.
 
 
 10
 In making her case of well-founded fear of persecution, her application also alleged that between the end of 1986 and March of 1987 she received five threatening letters from a pro-government terrorist group, the "Black Cats." In her testimony she modified the number of letters to six. She claimed to have destroyed four of the six letters in Sri Lanka, and to have brought the other two with her to the United States. She submitted the two letters, one with an accompanying envelope, in support of her petition. The letters claimed that she had deleted names from the government electoral lists and otherwise interfered with the pro-government forces, and that she was therefore under a "death sentence."
 
 
 11
 On March 5, 1991, the IJ gave an oral decision on the merits. For reasons discussed below, she found that Wijerathe was "not a credible witness," and came to the conclusion that Wijerathe "fabricated some, if not all, of the evidence in this case." AR at 64-65. The IJ therefore denied Wijerathe's applications for asylum and witholding of deportation without ever reaching the issue of whether Wijerathe's allegations, had they been true, would have established a well-founded fear of persecution. The IJ also denied the application for voluntary departure, finding that Wijerathe's presentation of false testimony precluded the finding of good moral character necessary to grant voluntary departure.
 
 
 12
 Wijerathe appealed to the Board of Immigration Appeals. The BIA dismissed her appeal on October 23, 1991, making substantially the same findings as had the IJ.
 
 ANALYSIS
 I. Asylum and Witholding of Deportation
 
 13
 An alien is entitled to mandatory witholding of deportation if she can establish that her life or freedom would more likely than not be threatened in her home country on account of race, religion, nationality, social group, or political opinion. 8 U.S.C. Sec. 1253(h)(1); INS v. Stevic, 467 U.S. 407, 429-30 (1984). The grant of asylum is discretionary, but may be made only upon a showing of "well-founded fear of persecution" on account of one of the five factors mentioned above. 8 U.S.C. Secs. 1158(a), 1101(a)(42)(A); Cardoza-Fonseca v. INS, 767 F.2d 1448 (9th Cir.), aff'd, 480 U.S. 421 (1987). Establishing a well-founded fear of persecution "requires a showing, by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear that the petitioner faces persecution." Rebollo-Jovel v. INS, 794 F.2d 441, 448 (9th Cir.1986). As this showing is easier to make than that required for witholding of deportation, an alien who cannot make it will necessarily also fail to win witholding of deportation. Id.; see Cardozo-Fonseca, 480 U.S. at 449.
 
 
 14
 The BIA found that Wijerathe did not establish a well-founded fear of persecution because her testimony and documentary evidence were not credible. We review the BIA's credibility determination for substantial evidence. Aguilera-Cota v. INS, 914 F.2d 1375, 1381 (9th Cir.1990). Under this standard, the BIA's determination can be reversed only if the evidence would compel a reasonable factfinder to conclude that Wijerathe's testimony and documents are credible. See INS v. Elias Zacharias, --- U.S. ----, 112 S.Ct. 812, 815 (1992). Concerning credibility this court has said,
 
 
 15
 Although an immigration judge's credibility findings are granted substantial deference by reviewing courts, a trier of fact who rejects a witness's positive testimony because in his or her judgment it lacks credibility should 'offer a specific, cogent reason for [his or her] disbelief.'
 
 
 16
 Id. (quoting Turicos v. INS, 821 F.2d 1396, 1399 (9th Cir.1987)). Moreover,
 
 
 17
 [w]hen the Immigration judge provides specific reasons for questioning a witness's credibility, this court may evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible.
 
 
 18
 Id. (quoting Vilorio-Lopez v. INS, 852 F.2d 1137, 1142 (9th Cir.1988).
 
 
 19
 The BIA in Wijerathe's case bases its adverse credibility determination upon a number of "specific, cogent" reasons, which we first list, and then evaluate.
 
 A. The BIA's Credibility Findings
 
 20
 The primary reason for the BIA's negative credibility determination concerned the Black Cats letters. At Wijerathe's hearing, the INS presented the forensic testimony of a "questioned documents" expert to the effect that the one envelope submitted by Wijerathe, in which she claimed one of the letters was delivered to her in 1987, could not have contained the letter in question. AR at 188 et seq. First, a blue stain which penetrated the envelope from front to back was not found on the letter. Second, the postal cancellation stamp imprint was found on the back of the envelope, but not on the letter. Finally, it appeared that the cancellation stamp actually bore the date of 1989, not 1987.
 
 
 21
 The BIA also disbelieved Wijerathe's explanation, which the IJ had characterized as "eleventh hour implausible and paltry," AR at 65, that she had perhaps placed the Black Cats letter in the wrong envelope some time after receiving it. She did not offer this explanation until the third hearing following the adverse testimony of the questioned documents expert. She was unable to explain how or why an envelope dated 1989 had reached her in the United States, as she left Sri Lanka in 1987.
 
 
 22
 The BIA also found it suspicious that Wijerathe did not present the Black Cats letters to her attorney in Texas or to the IJ at her hearing in 1988. At that time she did not claim any fear of persecution, should she return to Sri Lanka, and she did not apply for asylum. The BIA also noted that she had not enclosed the original letter or the envelope with her application for asylum, nor had she enclosed the other Black Cats letter in that application. Finally, the BIA found it inconsistent that Wijerathe had thrown away the first four threatening letters she had allegedly received, but had kept the latter two.
 
 
 23
 Further, the BIA noted several inconsistencies between Wijerathe's application for asylum and her subsequent testimony at the hearing. In the application, for instance, she claimed to have received a total of five Black Cats letters, all delivered to her at work. In her testimony, she claimed to have received six letters, four of which were sent to her home, and two to her office.
 
 
 24
 Further, Wijerathe's application and testimony were also inconsistent with a letter from her brother in Sri Lanka which she submitted into evidence. Purporting to summarize events he reported in his diary, he claimed there were a total of seven Black Cats letters. He claimed that one of them had been left on the doorstep of their house and that he discovered it there, an event which Wijerathe did not mention in her testimony. Wijerathe did not submit her brother's letter with her initial application for asylum, but rather waited until months later.
 
 
 25
 Finally, the BIA did not think Wijerathe had established that the Black Cats organization even existed at the time she purportedly received the letters (1986-87). Wijerathe submitted various news articles on the situation in Sri Lanka, as well as an Amnesty International (AI) report. However only one article and the AI report mentioned the Black Cats. The AI report specifically stated that to its knowledge the Black Cats had emerged in February, 1989. An October 1989 Los Angeles Times article also spoke of the Black Cats as a relatively recent phenomenon. Thus, aside from the declarations of Wijerathe and her brother, there was no direct evidence of the Black Cats' earlier existence.
 
 
 26
 2. Were the Credibility Findings Supported on the Record?
 
 
 27
 The fact that Wijerathe threw away four of the six Black Cats letters should not necessarily have weighed against her. In Aguilera-Cota, the petitioner had destroyed a threatening letter warning him to quit his government job. The court noted "the last thing a victim may want to do is carry around a threatening note with him." 914 F.2d at 1380. However it is true, as the IJ noted, that destroying four letters while bringing two to the United States might reasonably be seen as inconsistent behavior.
 
 
 28
 Wijerathe's failure to present all her evidence in her application for asylum also weighed heavily against her, as the BIA seemed to think her later evidence (the second Black Cats letter and the letter from her brother, for instance) was part of a hastily conceived, last-ditch effort to win asylum. In Aguilera-Cota, however, the petitioner testified at his hearing to at least two relevant incidents which he had not included in his application. The court there reversed the BIA's finding that this undermined his credibility. The court noted that asylum applications are often filled out by people with a poor grasp of the language and of the law relevant to asylum, and stated that immigration judges cannot expect such applications to be as comprehensive or thorough as a legal brief. Id. at 1382.
 
 
 29
 The inconsistencies between Wijerathe's testimony at her hearing and her application, especially when combined with the inconsistency of both those accounts with the letter sent by her brother, are more substantial problems for her credibility. Berroteran-Melendez, supra, 955 F.2d at 1256-57 (discrepancy between application and hearing testimony a reasonable basis for adverse credibility finding). Specifically, there seems to be little agreement about the number of Black Cats letters sent to her, the method by which they reached her, and the dates on which they arrived.
 
 
 30
 In Vilorio-Lopez v. INS, 852 F.2d 1137 (9th Cir.1988), two men, testifying to the same supposed incident of death-squad harassment, differed substantially as to how long ago the incident happened (one versus three years), differed substantially as to the length of time they said they were sheltered from the harassers (one hour versus overnight), and differed on whether they paid for their shelter. The IJ made these inconsistencies the basis of an adverse credibility finding against both men. This court reversed, saying, "minor inconsistencies in the record such as discrepancies in dates ... are not adequate basis for an adverse credibility finding." Id. at 1142 (quoting Damaize-Job v. INS, 787 F.2d 1332, 1337 (9th Cir.1986)). The court, however, was concerned that the inconsistencies in the two mens' stories were "possibly the result of mistranslation or miscommunication." Id. Further, the immigration judge had not supported the adverse credibility finding with any other facts in the record. Id.
 
 
 31
 Most damaging to Wijerathe's credibility was the BIA's finding that she had fabricated the Black Cats letters. As she rightly points out in her brief, this was based solely on forensic evidence concerning the envelope. The fact that neither letter came in the envelope, combined with the possible attempt to alter the envelope's cancellation date from 1989 to 1987, along with Wijerathe's inability to come up with an explanation until three hearings later, convinced the BIA she was not a credible witness, and indeed that she fabricated both letters.
 
 
 32
 In determining whether the record supports the BIA's adverse credibility determination, we heed the language of Aguilera-Cota:
 
 
 33
 It is not enough that the IJ has arrived at point B from point A, or that others might also; the question we must answer is: was it reasonable to do so?
 
 
 34
 914 F.2d at 1381. Given the forensic evidence, the lack of a sufficient alternative explanation, and the other inconsistencies in Wijerathe's testimony (as well as that of her brother), we conclude that the BIA was reasonable in making an adverse credibility determination. We therefore affirm its finding of no well-founded fear of persecution, and its consequent denial of asylum and witholding of deportation.
 
 
 35
 We note, however, that the BIA was not reasonable in making the further determination that Wijerathe presented false testimony and fabricated documentary evidence. Mere inconsistencies in testimony are not sufficient to establish that a witness is lying. Although Wijerathe could not establish the Black Cats' existence in 1987, neither did the INS establish that they did not exist. And, most importantly, while the forensic testimony concerning the envelope may undermine the letters' credibility, it does not by any means establish that they were deliberately fabricated. The BIA, in leaping to "point B from point A" to find that Wijerathe had lied and fabricated evidence, was unreasonable.
 
 II. Voluntary Departure
 
 36
 The IJ may, in his or her discretion, allow a deportable alien to depart the United States voluntarily, provided the alien has been of "good moral character" for the previous five years. 8 U.S.C. Sec. 1254(e). No person who has "given false testimony for the purposes of obtaining any benefits under this chapter" shall be found to have good moral character. 8 U.S.C. Sec. 1101(f)(6). Because the BIA found that Wijerathe "presented false testimony and fabricated documentary evidence" in her attempt to gain asylum, it held she was statutorily ineligible for voluntary departure. AR at 13, 16.
 
 
 37
 As noted above, however, this aspect of the BIA's findings was unreasonable. And while the BIA did reasonably find Wijerathe's testimony incredible, that does not amount to a finding that she gave false testimony under Sec. 1101. Indeed, it would make no more sense to hold that a witness whose testimony is found not credible has therefore "given false testimony" under Sec. 1101, than it would to hold that an incredible witness in any other adversary proceeding is automatically guilty of perjury.
 
 
 38
 We hold that the BIA erred in finding that Wijerathe gave false testimony as defined in Sec. 1101. As there is nothing else in the record to undermine a finding of good moral character, the BIA also erred in determining she was statutorily ineligible for voluntary departure.
 
 
 39
 We would ordinarily remand the final step--whether to grant Wijerathe voluntary departure, given that she is eligible under the statute--to the BIA's discretion. See Mabugat v. INS, 937 F.2d 426, 433 (9th Cir.1991). In this case, however, there are no factors (other than the erroneous finding of "false testimony") that weigh against voluntary departure. See, e.g., Estrada-Posadas v. U.S. INS, 924 F.2d 916, 920-21 (9th Cir.1991) (voluntary departure properly denied where petitioner had entered United States illegally, in company of smugglers). Indeed, prior to her asylum petition and the subsequent allegations of false testimony, an IJ granted Wijerathe voluntary departure, AR at 531-32, and the INS did not appeal that decision. Id. at 530. Having reversed the BIA's determination that Wijerathe presented false testimony, and having determined that she is statutorily eligible for voluntary departure, we reinstate the IJ's grant of voluntary departure.[1]
 
 
 40
 AFFIRMED, in part, and REVERSED, in part.
 
 
 
 *
 Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 We note that the IJ gave Wijerathe one year in which to leave the United States, which is beyond the maximum time provided for in the relevant INS regulations. 8 CFR Sec. 214.2(b)(1). The period should be limited to six months. Id