**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0688n.06

**No. 08-3893**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Oct 19, 2009**
LEONARD GREEN, Clerk

| | |
|---|---|
| EDUARD KACIQI, | ) |
| | ) |
|     Petitioner, | ) |
| | ) ON PETITION FOR REVIEW FROM A |
| v. | ) FINAL ORDER OF THE BOARD OF |
| | ) IMMIGRATION APPEALS |
| ERIC H. HOLDER, JR., | ) |
| | ) |
|     Respondent. | ) |

Before:  BATCHELDER, Chief Circuit Judge, DAUGHTREY, Circuit Judge, and VAN TATENHOVE,[*] District Judge.

**PER CURIAM.**  Petitioner Eduard Kaciqi[1] is an Albanian citizen who entered this country illegally and now seeks review of the Board of Immigration Appeals's decision denying his petition for asylum, withholding of removal, and relief under the United Nations Convention Against Torture.  Because we conclude that the Board was correct in affirming the immigration judge's rulings that Kaciqi lacked credibility and that country conditions in Albania have changed such that the petitioner would not reasonably be threatened with persecution upon return, we deny review.

---

[*]The Hon. Gregory Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1] In the administrative record, the petitioner's name is misspelled "Edvart Kacici," but it is clear from his signature on various documents that his name is actually Eduard Kaciqi.

Kaciqi, a native and citizen of Albania, arrived in the United States on April 26, 2002, at Houston's international airport, presented a fraudulent Greek passport to the immigration officer, and was charged as an inadmissible alien under 8 U.S.C. § 1225(b)(1). At the time of entry, he told the immigration officer that his reasons for coming to the United States were primarily economic: "I'm unemployed, my parents are unemployed, nob[o]dy works. There are no jobs in my country." He denied that he feared returning to Albania but was nevertheless provided with a "credible fear" interview a week later, at which time he changed his story, claiming that he had been "beaten, mistreated and detained for 8 days at the end of Jan. 2001." He also reported a second arrest around two weeks after his first. In addition, he claimed that he was arrested for a third time in June 2001 and detained for approximately two months after his cousin, a candidate for mayor, was killed by government officials and Kaciqi demanded that the police investigate. In removal proceedings in June 2002 and October 2002, he admitted removability under 8 U.S.C. § 1182(a)(6)(C)(i) and (a)(7)(A)(i)(I), but indicated that he intended to apply for asylum. He filled out an application for asylum dated October 23, 2002, but it was not signed or submitted at that time.

For reasons not apparent on the record, but perhaps due to a change in venue, the petitioner's asylum hearing did not take place until June 5, 2006. Kaciqi's completed application, submitted on the same date, included a family history that began with the former Communist government's purported confiscation of his grandfather's land and his father's birth in an internment camp. Kaciqi indicated in his application that he had worked

2

in Greece and traveled back and forth between Greece and Albania between 1997 and 1999, a period of social and political upheaval in Albania.  He also reported serving one year in the Albanian army, after which he purportedly joined the Democratic Party in 2001.  He claimed that he was harassed, arrested, and threatened while supporting his cousin's campaign for mayor of the village of Zhep.  He asserted that the police were in league with the Socialist Party, then in power, and that the Socialists opposed his cousin's candidacy for mayor because the cousin was affiliated with the Democratic Party.  After his cousin's alleged disappearance and murder, Kaciqi claimed, he pressed the police to investigate his cousin's death and supported the replacement candidate.  Kaciqi also swore in his application that shots were fired into his house on several occasions, giving rise to his fear that the local police force, sympathetic to the Socialists, would harm him if he were to return to Albania.

But, despite his sworn statements in the asylum application, Kaciqi's testimony at the asylum hearing conflicted in several significant ways with both his application and his supporting documentary evidence.  For example, at the hearing he claimed that he had served two months in the Albanian army, not a year as his application stated, and that he was beaten while in prison to the point of breaking his ribs, a key detail that was not included in his written application.  He also claimed at his hearing that he did not support the new mayoral candidate put forward by the Democrats after his cousin "disappeared," contradicting assertions in his application.  In addition, Kaciqi equivocated regarding the date of his last arrest, testifying initially that he was arrested in July 2001.  But, after being

3

reminded that his asylum application indicated that the arrest took place in June 2001, he changed his testimony. When confronted with a letter written by his brother that placed the time of his arrest in July, he first said that he made a mistake on his asylum application and that the arrest took place in July. He then changed his testimony again, insisting that his brother was mistaken about the date and that he had actually been arrested in June.

When asked about these inconsistencies, Kaciqi explained that he was "very nervous" and insisted that this was the reason why he kept changing the date of his last arrest. Questioned about his inconsistent answers during his first immigration interview in Houston, he said that he was hungry and tired when he told the officer he came into the country because of "economy problems" and that he omitted information about his arrests in Albania because he feared being beaten and imprisoned by U.S. immigration officers.

The government introduced Kaciqi's Albanian passport, which further undercut Kaciqi's claim about his alleged arrest in the summer of 2001. The Albanian passport contained stamps showing that he entered Greece from Albania on May 9, 2001, and did not leave Greece until December 25, 2001. Clearly, if Kaciqi had been in Greece between May and December 2001, then he could not have been imprisoned in Albania in June or July of the same year. Kaciqi later claimed that he was not in Greece at all in 2001 and that his brother-in-law must have used his passport to enter Greece while he was imprisoned. Kaciqi later obtained a written statement from his brother-in-law in which the brother-in-law claimed that he had used Kaciqi's passport to travel between Albania and

4

Greece in 2001. But this letter did not corroborate Kaciqi's testimony that the brother-in-law used the passport while Kaciqi was in prison. Instead, the letter said that the brother-in-law used the passport "during the period that Eduard Agron Kaciqi left Albania," flatly contradicting Kaciqi's testimony that he did not leave the country in 2001. Like many of the other documents submitted at the court hearing, the letter also had an improperly certified translation: the translator had affixed his own notary seal to the document, instead of certifying that he was competent to translate it and having his declaration notarized. Although the immigration judge observed that a notary is ordinarily not permitted to attest to his or her own signature, she apparently allowed the documents to be filed with the record.

In her oral decision, the immigration judge denied all forms of relief to Kaciqi, noting various inconsistencies in the petitioner's testimony, including several instances in which Kaciqi changed his story when confronted with conflicting evidence. Kaciqi had produced his uncle as a witness; he testified regarding his former work as a police officer in Korce and his yearly trips back to Albania. The immigration judge discounted his testimony, however, finding it not credible due to his demeanor while testifying and the pauses in his responses. She also noted that country conditions in Albania had changed and that the Democratic Party was now in power, lessening the possibility that Kaciqi would face persecution based on his political beliefs if he returned.

Kaciqi filed a timely appeal to the Board of Immigration Appeals. The Board dismissed his appeal, finding that the immigration judge's credibility assessment was not clearly erroneous and that the inconsistencies in the case were "substantial and go to the heart of the respondent's asylum claim, and have not been adequately explained by the respondent."

When the Board of Immigration Appeals has explicitly adopted the immigration judge's reasoning, we review the immigration judge's decision directly. *See Huang v. Mukasey*, 523 F.3d 640, 649 (6th Cir. 2008). Findings of fact must be upheld if they are supported by "reasonable, substantial, and probative evidence on the record considered as a whole," *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), and should not be disturbed on review "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The determination of a petitioner's credibility is considered a finding of fact. *See Sylla v. INS*, 388 F.3d 924, 925-26 (6th Cir. 2004). Subsequent to the passage of the REAL ID Act of 2005, Pub. L. No. 109-113, 119 Stat. 302, however, we no longer base credibility determinations on issues that go only "to the heart of the applicant's claim." *See Sylla*, 388 F.3d at 926. Instead, for any application filed after May 11, 2005, we base credibility determinations on the totality of the circumstances "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009) (citing 8 U.S.C. § 1158(b)(1)(B)(iii)). Similarly, an immigration judge's conclusion that an applicant has or has not established past persecution or a well-

founded fear of future persecution is also a question of fact; this conclusion is reviewed under the deferential "substantial evidence" standard. *See Elias-Zacarias*, 502. U.S. at 481.

A person seeking asylum bears the burden of proof to establish his or her status as a refugee. *See* 8 U.S.C. § 1158(b)(1)(B)(i). An asylum applicant's testimony alone may an adequate basis for granting relief, but that testimony must be believable, consistent, and plausible. *See* 8 U.S.C. § 1158(b)(1)(B)(ii); *Ali v. Ashcroft*, 366 F.3d 407, 411 (6th Cir. 2004). An immigration judge may arrive at a credibility determination by considering an applicant's candor or demeanor as a witness, the consistency between various written and oral statements made by the applicant, the plausibility and consistency of the applicant's statements, and the consistency of the applicant's statements with other evidence of record, including State Department Country Reports. *See* 8 U.S.C. § 1158(b)(1)(B)(iii).

The credibility determination is crucial, because an applicant who is found not credible cannot meet the required burden of proof in an asylum case. *See Hassan v. Gonzales*, 403 F.3d 429, 435 (6th Cir. 2005). Nor can an applicant found not credible meet the higher "clear probability" standard for withholding of removal or CAT relief. *See Ndrecaj v. Mukasey*, 522 F.3d 667, 677 (6th Cir. 2008).

In challenging the immigration judge's determination that the petitioner's testimony was not worthy of credit, Kaciqi contends that the conflicts between his testimony and the documentary evidence submitted to support his claim were limited to minor inconsistencies

that did not go to the heart of his claim and that he provided adequate explanations for the discrepancies. He also asserts that he provided an adequate explanation for the stamps in his passport indicating that he had left Albania during the time period in which he was allegedly imprisoned for political activity. As we have stated, however, the standard that Kaciqi seeks to employ is no longer applicable to petitions like his that were filed after May 11, 2005.

Kaciqi cites several cases from our circuit and others in support of his claims regarding credibility. Two of these cases involve obvious misunderstandings based on translation mistakes or typographical errors. *See Ahmed v. Gonzales*, 398 F.3d 722, 727 (6th Cir. 2005) (due process challenge proper in a case in which interpreter error or judge's failure to understand petitioners' clear testimony would result in unfair hearing); *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986) (typographical error involving applicant's son's birth date did not damage his credibility). There is no indication that Kaciqi was prejudiced by interpretation or translation errors. An Albanian interpreter was provided for him at his hearing in Detroit and also at his initial interviews at the Houston airport. At his asylum hearing, the immigration judge cautioned Kaciqi to listen to the full interpretation of questions into Albanian and not to attempt to answer the questions immediately after they were asked in English. She also gave Kaciqi time to review his application at the hearing and make any needed corrections and, as a result, his attorney made several handwritten amendments to the application but did not change the statement related to

Kaciqi's military service. Kaciqi himself arranged for all ten of the documents submitted to the court to be translated from Albanian to English.

Despite these corrections, the immigration judge determined that Kaciqi's testimony was not credible, basing her conclusion on inconsistencies that were not collateral but, instead, went to the heart of the petitioner's claim. They included Kaciqi's failure to mention beatings so severe that he suffered broken ribs, a conflict between Kaciqi's testimony and his application regarding his support for the candidate who replaced his cousin, and shifting testimony concerning the month in which his last arrest occurred. Kaciqi's statement that he came to the United States for economic reasons, the stamps in his passport showing that someone had used it to enter Greece during the time in which he was allegedly imprisoned in Albania, and discrepancies between Kaciqi's testimony and that of his uncle were also considered by the immigration judge in arriving at her credibility determination. Furthermore, the judge noted that Kaciqi had failed to produce corroborative evidence that must have been readily obtainable, such as written statements from his own parents and his cousin's parents. After all, Kaciqi testified that he spoke to his parents frequently on the telephone, and he was able to obtain a written statement from his brother-in-law on short notice.

Additionally, the immigration judge had the opportunity to observe the petitioner's demeanor and his responses to questioning and cross-examination, factors that are a legitimate basis for finding that an applicant is not credible. *See* 8 U.S.C.

§ 1158(b)(1)(B)(iii); *Ndrecaj*, 522 F.3d at 674. Our review of the transcript establishes that Kaciqi repeatedly changed his story when confronted with evidence to the contrary – for example, when he changed the date of his last imprisonment from June to July and then back again to June after being confronted with conflicting evidence. With regard to other significant inconsistencies in his testimony, Kaciqi simply failed to give explanations that would be persuasive to a reasonable finder of fact or that would compel us to overturn the immigration judge's credibility findings on appeal.

Finally, the immigration judge observed that "[e]ven if th[e] Court were to overlook the numerous inconsistencies and omissions in this record, [it] would still deny [Kaciqi's] application for relief and protection on the merits." Specifically, the judge found that the petitioner's claim of past persecution had not been established and that he could not, therefore, avail himself of the presumption that he had a well-founded fear of facing future persecution. *See Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (citing 8 C.F.R. § 208.13(b)(1)(i)). Moreover, in this case any such presumption would have been squarely rebutted by the government's proof that conditions in the applicant's country of origin had changed to such an extent that the applicant would no longer reasonably fear persecution if he were to return to Albania. *See Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003).

The State Department's Country Reports for Albania establish that the political climate there has changed dramatically since Kaciqi left the country in 2002. They show that Kaciqi's party, the Democratic Party, is currently in power in Albania; that the major

parties – both the Democrats and the Socialists – have repudiated the country's Communist past; and that there are no credible reports of political parties using the government to repress opponents while they are in power. And, although the relevant report does note that violence and police corruption remain problems in sections of Albania, it further establishes that there have been no credible reports of politically-motivated violence and detention in the recent past.

Applying this general information from the Country Report to Kaciqi's specific situation, we conclude in this case, as we have in several others, *see*, *e.g.*, *Ndrecaj*, 522 F.3d at 676, that it appears wholly unlikely that a supporter of the Democratic Party could reasonably fear persecution based on his political opinion while his party is in power. Moreover, Kaciqi's speculation that the Democratic Party might eventually lose an election or that the Socialists might gain political power through some other means is simply insufficient to establish a well-founded fear of future persecution. As the immigration judge noted at the time of the hearing, Kaciqi's mother, father, and sister remained in Albania and, according to the asylum application, Kaciqi's father was an active member of the Democratic Party, yet no one in the immediate family had been targeted or harmed based on political opinion. We conclude that there is substantial evidence to support the immigration judge's decision to deny asylum to the petitioner.

Finally, because the petitioner cannot establish grounds for a grant of asylum, he cannot meet the higher standard of proof required for granting withholding of removal or

protection under the United Nations Convention Against Torture.  *See Ndrecaj*, 522 F.3d

at 677.

For the reasons set out above, we affirm the decision of the immigration

judge and, therefore, DENY the petition to review the decision of the Board of Immigration

Appeals.