Tsion M. KAHSSAI, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 92–70289.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1993.

Decided Feb. 4, 1994.

Dan P. Danilov, Seattle, Washington, for the petitioner.

Donald Couvillon, United States Department of Justice, Washington, D.C., for the respondent.

Before: REINHARDT, BRUNETTI, and FERNANDEZ, Circuit Judges.

PER CURIAM:

Petitioner Tsion Kahssai applied for asylum, 8 U.S.C. § 1158, and withholding of deportation, 8 U.S.C. § 1253(h). The immigration judge (IJ) denied Kahssai's application, and the Board of Immigration Appeals (BIA) affirmed the denial. The BIA issued its ruling in a short opinion in which administrative notice was taken of political changes in Ethiopia that had occurred subsequent to Kahssai's deportation hearing. We have jurisdiction over Kahssai's appeal of the BIA ruling, 8 U.S.C. § 1105a(a)(1), and we grant her petition for review in accordance with *Sarria–Sibaja v. INS*, 990 F.2d 442 (9th Cir.1993).

## I.

At a March 1990 deportation hearing before an immigration judge, Tsion Kahssai, her sister Dell Kahssai, and her two brothers, Abraham and Atsbaha Kahssai, testified as follows:[1] Kahssai was born in Addis Ababa, Ethiopia in 1971 to a family of Ethiopian Jews. Her father, a merchant from Eritrea, was arrested, tortured, and killed in April 1974 during the Communist revolution. The new Communist government believed that he was an Eritrean rebel, and was suspicious of him because of his Jewish background. His family members were told that he had died of a heart attack. They believe that he was shot, however: even though they were not allowed to examine his body, which was returned to them in a closed coffin, others who saw the body told them that it was pierced with bullet holes.

Approximately one month after the father's killing, the government arrested and killed Kahssai's eldest brother, who was then somewhere between seven and ten years old. His killing was in further retaliation for the suspected rebel activity of Kahssai's father. In September 1974, Kahssai's mother was arrested; she was pregnant at the time. The government detained her for a few months, interrogating her about her husband and children, and releasing her shortly before she gave birth to another daughter. Soon after giving birth, she disappeared.[2]

Left without parents, Kahssai and her two surviving brothers were taken in by her uncle, the husband of her mother's sister. The uncle converted to Christianity, which meant that Kahssai and her brothers became Christians as well, since their uncle was raising them as his children. The uncle's decision to leave the Jewish faith was motivated by discrimination. As Tsion Kahssai explained, "we had to change our religion in order to survive."

In February 1980, Kahssai's uncle brought the family to India, where he worked as an engineer for Ethiopian Airlines. Since then, Kahssai has never been back to Ethiopia. She came to the United States in August 1988 as a non-immigrant visitor to see members of her family. During her visit to the U.S., her uncle retired from his job and returned to Ethiopia. Kahssai then decided to apply for asylum because she feared that she would face persecution if she returned to Ethiopia.

Kahssai's siblings all emigrated to the U.S. before Kahssai, and all have been granted asylum here.

## II.

■ The BIA supported its denial of Kahssai's asylum application by taking administrative notice of recent political changes in Ethiopia. It noted that the former Ethiopian President fled the country in 1991, that a multiparty transitional government had been formed, and that the new regime had a substantially better human rights record than the past regime. The change in government occurred after Kahssai's deportation hearing, and thus she had no opportunity to show cause why notice should not be taken, or to rebut the noticed facts.[3]

In *Castillo–Villagra v. INS,* 972 F.2d 1017, 1026 (9th Cir.1992), we found that the BIA erred in taking administrative notice of a change in government in the alien's home country without warning the alien that notice

---

1. Not all of the Kahssais' testimony was based on personal recollection. The events most significant for Tsion Kahssai's asylum claim occurred in 1974, when Haile Selassie's government in Ethiopia was overthrown by Communist forces. Tsion Kahssai was only three years old at the time, and her two brothers were approximately ages seven and eight, and thus their testimony regarding these events was partially based on what others later told them. Tsion Kahssai's sister Dell was eighteen in 1974, but she could only testify personally to some of the relevant events, as she left Ethiopia in June 1974.

2. The siblings have not seen their mother since 1974 and were not certain of her present address, but they have had news that she is in the Sudan.

3. *Acewicz v. INS,* 984 F.2d 1056 (9th Cir.1993), is irrelevant to our analysis here, since our decision in that case was based on the fact that the change in government occurred *prior* to the deportation hearing, so that the Polish aliens had "ample opportunity" to discuss the impact of the change, and "did in fact introduce evidence before the immigration judge" regarding the change. *Id.* at 1061.

would be taken. We emphasized that, as a corollary to the requirement of a full and fair hearing, "due process requires that the [asylum] applicant be allowed an opportunity to rebut" the noticed facts. *Id.* at 1029.

The INS asserts that *Castillo–Villagra* does not control our analysis here because the BIA "in no way relied 'entirely' on the regime change in Ethiopia" in denying Kahssai's claim. However, we already rejected this argument in *Sarria–Sibaja, supra. Sarria–Sibaja* held that remand is required when the BIA supports a ruling using grounds other than administrative notice, but does not explicitly state that the alternative grounds constitute an independent basis for dismissing the alien's claim. *Sarria–Sibaja,* 990 F.2d at 444. In *Sarria–Sibaja,* the BIA introduced its administrative notice section with the word "Moreover," indicating that its reasoning was cumulative. *Id.* Here, similarly, the BIA uses the words "In addition."

█ The petition for review is therefore granted.[4]

REINHARDT, Circuit Judge, concurring:

Kahssai's asylum claim is based upon the arrests and killings of her father and brother, the detention of her mother, and her own forcible assumption of a new identity. The BIA was unconvinced by her claim, finding that (1) political conditions had changed in Ethiopia, (2) her testimony lacked credibility, and (3) even if her family had suffered persecution, Kahssai herself had not. In light of these findings, it ruled that Kahssai had not established her statutory eligibility for asylum.

In our per curiam opinion, we remand this case to correct the BIA's erroneous use of administrative notice. We express no opin-

ion on the other issues involved in Kahssai's asylum claim. Nevertheless, I believe that some indication of our views might be helpful to the BIA. Accordingly, I write separately to make clear my own disagreement with the BIA's assessment of the issues of credibility and persecution in this case.

I.

The BIA adopted the IJ's credibility determination, stating that the "[a]fter a careful review of the record, we find that there is no adequate basis for overturning the immigration judge's adverse credibility finding." It should be noted, however, that while purporting to defer to the IJ, the BIA inaccurately characterizes his finding. The IJ did not simply find that Kahssai's testimony lacked credibility, as the BIA states. Instead, the IJ challenged Kahssai's credibility *only* as to her alleged fear of persecution. He specifically noted that her credibility in describing the events of 1974 "cannot be determined" because of her young age at that time. Finally, the IJ made no explicit credibility determination as to Kahssai's testimony regarding later events. His description of those events, however, is consistent with her testimony, so that it is reasonable to assume either that he found the testimony credible or that it in fact is so. *See Damaize–Job v. INS,* 787 F.2d 1332, 1338 (9th Cir.1986).

The substance of Kahssai's asylum claim hinges on the events of 1974. As Kahssai stated, in that year, "everything happened in the family": she lost her father, her brother, her mother, and as a result she was forced to take on a new identity and a new religion. By declining to make credibility findings with respect to Kahssai's testimony and that of her siblings concerning the events of that

4. Kahssai also asserts that she was denied due process because the BIA issued a "boilerplate" opinion. A boilerplate opinion "set[s] out general legal standards yet [is] devoid of statements that evidence an individualized review of the petitioner's contentions and circumstances ..." *Castillo v. INS,* 951 F.2d 1117, 1121 (9th Cir. 1991). Boilerplate opinions are insufficient both because they show that the alien's claim did not receive fair review from the BIA, and because they do not provide an adequate basis for judicial review. *Id.*

The opinion issued in Kahssai's proceeding is not boilerplate: it adequately describes the particulars of her claim, including the death of her father and brother, the detention of her mother, and her subsequent life with her uncle. *Cf. Rhoa–Zamora v. INS,* 971 F.2d 26, 36 (7th Cir. 1992) (BIA opinion inadequate when "there is nothing in the opinion to suggest that the Board was even aware of the particular claims made by [the aliens].... There is nothing individualized about the Board's analysis ..." ), *cert. denied,* —— U.S. ——, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993).

year, and thereby declining to rule on whether he believes the events did or did not occur, the IJ stripped Kahssai of a proper opportunity to establish her claim.

Generally, an IJ's credibility determinations are reviewed for substantial evidence. *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir.1987).[1] The explicit *refusal* to make a credibility determination should not be due the same deference;[2] but even were this deferential standard to be applied, the IJ's ruling would fail. The IJ based his refusal to evaluate Kahssai's credibility in describing the events of 1974 on the fact that Kahssai was extremely young at the time, and as a result her testimony regarding those events was the result of secondhand knowledge.

1. My discussion will focus on the IJ's evaluation of Kahssai's credibility in light of the BIA's explicit deference to the IJ on this point. *See Yepes–Prado v. INS*, 10 F.3d 1363, 1366–67 (1993). Normally, however, when the BIA engages in *de novo* review of the IJ's factual determinations, we consider only the BIA decision because any errors made by the IJ will be rendered harmless. *See Elnager v. INS*, 930 F.2d 784, 787 (9th Cir.1991).

2. The situation here differs from that of past cases that we have remanded to the BIA for credibility findings after the BIA had declined to make such findings because it rejected the alien's claim even assuming the facts as true. *See, e.g., Garcia–Ramos v. INS*, 775 F.2d 1370, 1372, 1375 (9th Cir.1985); *Argueta v. INS*, 759 F.2d 1395, 1398 n. 4 (9th Cir.1985). In each of those cases, the IJ had made the necessary credibility findings, but the BIA had not found it necessary to adopt them.

3. Consider, for example, this interchange:

Kahssai: ... I would see men ... a lot of men rushing here and there. And I didn't understand what it was but I asked my mom what it was.

Judge: Are you ... are you trying to remember all the things that happened in 1974?

Kahssai: I did remember a few.

Judge: Is that what you're talking about right now?

Kahssai: Yes, sir.

Judge: About 16 years ago?

Kahssai: Yes, sir.

Attorney: Continue.

Kahssai: And then they would come and they would take my father. And I didn't know what it was. I was too young but I asked my mom and she would say it's nothing. That it would be okay, it would be okay. But ...

Attorney: Do you know how long he was gone, if you remember?

Kahssai: I never saw him again.

These facts do not justify an abdication of the IJ's responsibility to make a credibility determination, however. First, portions of Kahssai's testimony were explicitly based on personal recollection.[3] Even at age three, one is likely to remember the traumatic loss of one's family. Second, there is a difference between describing things that one learned as a child, and reciting a fabricated story.[4] The IJ did not say that he thought Kahssai was lying. But if she was telling the truth about being raised by her uncle and being told that her father and brother had been killed, and her mother arrested, then, even without a living eyewitness to the events who could testify before the IJ, there is no reason to doubt that the events occurred.[5]

4. The IJ's refusal to evaluate Kahssai's testimony regarding these events may be due to a mistake on his part. In explaining his refusal, he says that Kahssai did not discover her true relationship to her uncle until 1988, and only at that point did she learn about the events of 1974. But Kahssai did not say this: she simply said that, in order to protect her, her uncle told *others* that she was his daughter.

Thus, the IJ might have believed that it would be difficult for him to recognize whether Kahssai was honestly describing events that she herself had only recently discovered.

5. The IJ and INS counsel demonstrate an apparent fixation on eyewitness testimony that would severely hamper many asylum claims. Consider the following exchange:

INS Counsel: You were told that your father died of a heart attack?

Dell Kahssai: We were told.

INS Counsel: You have no personal knowledge of what actually happened to your father?

Dell Kahssai: Well, I do. He was taken from home and he was interrogated ...

Judge: You weren't there, were you?

Dell Kahssai: When I left ...

Judge: No, no, no. By personal knowledge means that you saw them say ...

Dell Kahssai: I was there when he died. I was there when he died. But they would not let me see the body.

Of course, eyewitness testimony is most reliable. Few repressive governments, however, are so unconcerned with human rights standards that they openly flaunt their political persecution, inviting eyewitnesses to executions and producing bullet-ridden bodies for public display. The narrow conception of personal knowledge that the IJ would impose on asylum proceedings would, for example, have barred family members of "disappeared" people in Argentina from describing the deaths of their relatives as part of their asylum claims.

Finally, the IJ made no explicit credibility determination regarding the testimony of Kahssai's brothers and sister. Generally, when findings have not been made regarding a witness' credibility in a deportation hearing, the reviewing court should presume that the IJ found the witness' testimony credible. *Artiga Turcios v. INS,* 829 F.2d 720, 723 (9th Cir.1987). All three of the siblings testified to the events in question, confirming Kahssai's description of them. Kahssai's sister Dell was 18 in 1974, old enough so that her testimony regarding the father's death could have been sufficient to establish it as a fact (she had left Ethiopia by the time of her mother's detention and disappearance).

The IJ impliedly cast doubt upon the siblings' credibility by stating that they "differed in their recollection of the death of their father, which ranged from heart attack to execution, and were totally inconsistent with respect to their mother's alleged imprisonment." Here the IJ's recollection is faulty, rather more than the witnesses'. All of the siblings agreed that the father was executed, and although the sister stated that the authorities told them that he died of a heart attack, her testimony clearly indicated that she did not believe this explanation. As for their testimony regarding the fate of the mother, the only inconsistency was that Tsion Kahssai said that the mother was tortured while Dell Kahssai said she was not; they agreed that the mother was imprisoned, interrogated, and then released because of her pregnancy. This one inconsistency is minor in relation to the bulk of the evidence presented, and minor inconsistencies are insufficient to support a credibility challenge. *See Damaize–Job,* 787 F.2d at 1337.

In addition to his failure to make credibility determinations regarding these past events, the IJ expressly doubted the credibility of Kahssai's testimony regarding her fear of future persecution. Of course, the IJ's unwillingness to believe the Kahssai's family had suffered persecution in the past would partially account for his scepticism regarding Kahssai's fear of future persecution. Moreover, his additional reasons for challenging Kahssai's credibility regarding future persecution are either irrelevant or unsound. As we explained in *Aguilera–Cota v. INS,* 914 F.2d 1375 (9th Cir.1990), such grounds cannot support a negative credibility determination. Instead,

> The IJ must not only articulate the basis for a negative credibility finding, but those reasons must be substantial and must bear a legitimate nexus to the finding. Thus, there must be a rational and supportable connection between the reasons cited and the conclusion that the petitioner is not credible.

*Id.* at 1381. The reasons stated by the IJ fail this standard. He cites the fact that Kahssai's uncle allegedly prefers to claim asylum in the United States rather than India, as if it reflects badly on Kahssai's own claim. The circumstances in Kahssai's case and those of her uncle's are entirely different. Moreover, the question of the desires of Kahssai's uncle is wholly irrelevant to the focus on individual circumstances mandated for asylum proceedings. *See, e.g., Sanchez–Trujillo v. INS,* 801 F.2d 1571, 1574 (9th Cir.1986). The IJ also contends that Kahssai was permanently resettled in India, or could have applied for asylum there. First, the failure to apply for asylum in other countries is clearly not relevant to a credibility determination (*see Damaize–Job,* 787 F.2d at 1337). Nor is the issue of "firm resettlement" relevant to an evaluation of the alien's statutory eligibility for asylum, but instead only to the subsequent step of weighing discretionary factors (*see* 8 C.F.R. §§ 208.14 & 208.15; *Matter of Soleimani,* Int.Dec. 3118 (BIA 1989)). Next, Kahssai lived in India between the ages of nine and seventeen: it would be unreasonable to hold an adolescent responsible for arranging or failing to arrange permanent resettlement.

Finally, the IJ states that it is unbelievable that members of Kahssai's father's family would be persecuted while her uncle—the husband of her mother's sister—would entirely escape harassment. Here, the IJ's view of Ethiopian family relationships is based on unfounded assumptions not applicable to a society in which the dominant family member is without question the husband, and the woman submissively marries into her spouse's family. The IJ fails to consider that

where we see one family, the Ethiopian government sees two families: one headed by Kahssai's father, who was the object of persecution, and one headed by her uncle, who was not considered to be an enemy of the state.

In short, I believe that the IJ clearly erred in finding that Kahssai lacked credibility in describing her fear of persecution. There is no substantial evidence in the record supporting his conclusion, since "the information relied upon by the IJ to question [Kahssai's] credibility reveals nothing about whether or not [Kahssai] is an honest individual," or whether or not she truly fears for her safety in Ethiopia. *Damaize–Job*, 787 F.2d at 1338.

Both the IJ's specific unwillingness to make a credibility determination regarding the events of 1974, which effectively made the rest of Kahssai's claim irrelevant, and the invalid basis for his negative credibility determination regarding her fear of persecution, should have caused the BIA to refrain from deferring to his findings and, instead, to make its own independent determination. In that regard, I note that there is no contradictory evidence in the record to undermine Kahssai's claim, nor is there " 'any inherent improbability [or inconsistency] in [Kahssai's] testimony' itself." *Id.* (quoting *White Glove Building Maintenance v. Brennan*, 518 F.2d 1271, 1274 (9th Cir.1975)).

## II.

The BIA also contends that Kahssai has not established her statutory eligibility for asylum because she has not shown that she, herself, suffered persecution in the past, only that members of her family may have been political victims. Despite the deaths of her father and brother, and the detention and disappearance of her mother, the BIA dismisses Kahssai's claim partially on the ground that Kahssai herself "was never detained, interrogated, convicted and sentenced, or imprisoned" in Ethiopia. Here, the BIA's narrow focus is inconsistent with the demonstrated practices of the Ethiopian authorities, as well as with the dictates of our case law.

Ethiopian officials suspected only Kahssai's father of anti-government activities, yet they killed Kahssai's oldest brother and detained and interrogated her mother. As Kahssai explained at her deportation hearing, "in Ethiopia ... if one family member is in trouble ... the rest of the family is in trouble." Moreover, the fact that Kahssai was not physically abused prior to 1980, when she left Ethiopia, does not mean that her present fear of physical persecution lacks an objective basis. It is not necessary for an intended victim of a violent or savage regime to await the infliction of actual physical injury before fleeing. Given that Kahssai was nine years old in 1980, she might have been young enough not to be a threat; now, at age twenty-two, she might well have "reached an age that renders her suspect." *See Ramirez Rivas v. INS*, 899 F.2d 864, 870 (9th Cir. 1990) (reversing BIA denial of asylum to El Salvadorian woman who had never been physically threatened, emphasizing that while in El Salvador the woman was young teenager, but now young adult), *vacated on other grounds*, — U.S. —, 112 S.Ct. 858, 116 L.Ed.2d 766 (1992).

In *Ramirez Rivas*, this court found that the past persecution of family members supported the asylum claim of a daughter in the family, even though the daughter was a political neutral and had never been persecuted herself. Similarly, in *Hernandez–Ortiz v. INS*, 777 F.2d 509, 515 (9th Cir.1985), we emphasized the relevance of violence directed against an alien's family members, finding that "[t]he fact that there have been a number of threats or acts of violence against members of an alien's family is sufficient to support the conclusion that the alien's life or freedom is endangered." *See also Rodriguez v. INS*, 841 F.2d 865, 870–71 (9th Cir.1987); *Ananeh–Firempong v. INS*, 766 F.2d 621, 627 (1st Cir.1985) ("evidence about treatment of [the alien's] family is probative of [a specific threat to the alien]"); U.N. High Comm'r for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status, ¶ 43 at 13 (threat of persecution "need not be based on the applicant's own personal experience.... [Evidence concerning relatives] may well show that his fear ... of persecution is well founded."). These authorities are

concerned with violence against family members because past experience has shown that what occurred to Kahssai's family is not unique or even rare: government suspicion of one family member is easily generalized into suspicion, and persecution, of the rest. Thus Kahssai could certainly have a legitimate fear of future persecution whether or not she had herself been subjected to direct physical abuse in the past.

### III.

The BIA ruled that if Kahssai suffered past persecution, it did not rise to a level of severity sufficient to warrant a "humanitarian" grant of asylum, as asylum based solely on past persecution has been termed. In making this determination, the BIA looked to the circumstances described in *Matter of Chen*, Int.Dec. 3104 (BIA 1989), stating that asylum might be granted Kahssai if she demonstrated that her "past persecution had been so severe that return to the country of persecution would be inhumane."

The alien in *Chen* was a Chinese Christian who was variously beaten, harassed, and deprived of food and medical attention from the age of eight. The abuse described in *Chen* was exceptionally inhumane, and granting asylum solely on the basis of past persecution was clearly appropriate in those circumstances. However, the fact that *Chen* is a sound example of asylum based on past persecution does not mean that it established the applicable standard for evaluating all such asylum claims. In fact, the BIA's narrow focus on the atrocities described in *Chen* is in disregard of this court's decision in *Desir v. Ilchert*, 840 F.2d 723 (9th Cir.1988). It was in *Desir* that we originally ruled that "past persecution, without more, satisfies the [requirements of the asylum statute], even independent of establishing a well-founded fear of future persecution." *Id.* at 729.[6] The Haitian petitioner found eligible for asylum in *Desir* had suffered "beatings, imprison-

ment, and assaults by government security forces for the purpose of extortion." *Id.* at 724. The abuse suffered by the alien in *Desir* did not, however, rise to the level of that later described in the BIA's decision in *Chen*.

On remand, the BIA should look to *Desir* for the relevant comparison in evaluating Kahssai's claim of past persecution. In doing so, the BIA should not, of course, require identical forms of abuse, but instead should look for comparable severity. Here, Kahssai was stripped of her identity in 1974. She lost her family and her religion. The fact that she did not suffer physical harm is not determinative of her claim of persecution: there are other equally serious forms of injury that result from persecution. For example, when a young girl loses her father, mother and brother—sees her family effectively destroyed—she plainly suffers severe emotional and developmental injury. *Cf.* Henley, *Dutch Jews See Lasting Horror for Yugoslav Child Victims*, Reuter Library Report, Aug. 25, 1992, *available in* LEXIS, Nexis Library. To take her from her remaining family members in the U.S. and force her to return to the place where her family was persecuted might only compound that injury. Under these circumstances, *Desir* might well direct the grant of asylum based on past persecution.

### *Conclusion*

In affirming the IJ's denial of Kahssai's asylum and withholding of deportation application, the BIA: (1) took administrative notice of political changes in Ethiopia without warning Kahssai that notice would be taken, (2) deferred to the IJ's unsupported adverse credibility determination, (3) incorrectly required Kahssai to show actual childhood physical persecution, and (4) applied an overly stringent standard in evaluating Kahssai's eligibility for asylum based on past persecution. Our remand to the BIA will allow it to

---

**6.** *Desir* is the only Ninth Circuit case in which an alien's eligibility for asylum has been based solely on past persecution. Two later cases discussing the issue have, however, looked to *Chen* for guidance. *See Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir.1993); *Castillo–Villagra*, 972 F.2d at 1031; *cf. Castillo v. INS*, 951 F.2d 1117, 1120

(9th Cir.1991) (noting that BIA denied asylum based on past persecution after comparison with *Chen* ); *Berroteran–Melendez v. INS*, 955 F.2d 1251, 1255 n. 3 (9th Cir.1992) (only other Ninth Circuit case discussing past persecution, citing *Desir* ).

reassess its determination of these issues in evaluating Kahssai's entitlement to withholding of deportation and eligibility for asylum.